2025 IL App (4th) 240689

FILED
April 9, 2025
Carla Bender
4th District Appellate
Court, IL

NO. 4-24-0689

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| SAMUEL L. SKINNER, | ) | No. 16CF588 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Brendan A. Maher, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Lannerd and Grischow concurred in the judgment and opinion.

**OPINION**

¶ 1 In May 2021, defendant, Samuel L. Skinner, entered an open plea of guilty to

unlawful possession of a controlled substance (720 ILCS 570/402(a)(1)(A) (West 2016)), and he

was ultimately sentenced to 20 years in prison. When sentencing defendant, the trial court

considered evidence from a codefendant's case, over which the court also presided.

¶ 2 Defendant appeals, arguing that he was denied a fair sentencing hearing because

the trial court considered facts from a codefendant's case. We disagree and affirm.

¶ 3                              I. BACKGROUND

¶ 4                        A. The 2016 and 2019 Cases

¶ 5 In March 2016, defendant was charged in case number 16-CF-588 (the 2016 case)

with possession of heroin with the intent to deliver, a Class X felony (*id.* § 401(a)(1)(A)).

Because defendant was charged with a Class X felony and had two prior Class X felony

convictions, he faced a sentence of natural life in prison. 730 ILCS 5/5-4.5-95(a) (West 2016).

¶ 6        In October 2016, defendant posted bond in the 2016 case. One condition of his bond was he could not commit other crimes.

¶ 7        In September 2019, while defendant remained on bond in the 2016 case, he was charged in case number 19-CF-2598 (the 2019 case) with armed violence (720 ILCS 5/33A-2(a) (West 2018)), possession of a weapon by a felon (*id.* § 24-1.1), fleeing to elude (625 ILCS 5/11-204(a) (West 2018)), and possession of a controlled substance with the intent to deliver (720 ILCS 570/401(a)(7.5)(A)(ii) (West 2018)). Defendant again faced a sentence of natural life in prison in the 2019 case due to his prior felony convictions. See 730 ILCS 5/5-4.5-95(a) (West 2018).

¶ 8        Also in September 2019, the State petitioned to revoke defendant's bond in the 2016 case, and the trial court granted the State's request.

¶ 9        Defendant's cousin, Cordaine Harris, was also charged for his participation in the 2019 case. The same judge presided over both defendant's and Harris's cases.

¶ 10        After September 2019, the State and defendant, who was represented by attorney Glenn Jazwiec, attempted to reach a plea agreement that would resolve both the 2016 and 2019 cases. Meanwhile, the trial court conducted Harris's jury trial. The jury acquitted Harris of possession of a weapon by a felon, the sole charge brought against him.

¶ 11               B. The Bond Hearing in the 2016 and 2019 Cases

¶ 12        In September 2020, Jazwiec filed motions to (1) reinstate bond in the 2016 case and (2) reduce bond in the 2019 case. Later that same month, the trial court conducted a hearing on defendant's motions, at which defendant testified on his own behalf. Defendant stated, if he was released, he would live with his mother in her home, help take care of her and her

household, and return to the job he had when he was arrested. He also testified (1) his mother would take him to court for proceedings in both cases, (2) he had extended family in the area, and (3) he would not have contact with Harris. Defendant offered and the court admitted into evidence letters from defendant's mother, employer, and church.

¶ 13 Thereafter, the State made a factual proffer for both the 2016 and 2019 cases. The trial court mentioned it knew "very little" about the 2019 case, "other than what [it] learned through *** Harris'[s] case." The State made a proffer of facts for the 2019 case, as follows:

"[O]n September 26th, 2019, at 1:47 in the morning, Rockford Officer[s] Ceja and Shelton were on patrol in Rockford. Officer Ceja heard multiple gunshots coming from Rockton Avenue and Whitman Street. He observed a Chevy Suburban traveling on Whitman and a registration return to [defendant]. The officers activated their emergency lights and attempted to stop the Suburban. The Suburban failed to stop for the officers and drove away from them.

Officer Johnson joined the pursuit and saw the Suburban disregard a traffic light at Whitman Street and Kilburn Avenue and disregard a stop sign at School Street and Avon Street. Officer Johnson paced the Suburban at approximately 60 to 65 miles per hour on School Street.

The Suburban eventually pulled into the driveway of 715 Independence Avenue in Rockford. The driver was identified as [defendant]. The passenger was identified as *** Harris. [Defendant] was removed from the vehicle and searched. Officer Welch found $858 on [defendant's] person.

Meanwhile, Officer Swanson advised he found 9mm shell casings in the area of Woodlawn Avenue where the shots fired had alerted. Officers impounded

the [S]uburban and searched it. They found 9mm rounds and three 80 caliber rounds and a plastic baggie in the center console. Officers also found nine and a half grams of suspected cocaine, 40 suspected Ecstasy pills and a 9mm Taurus semi-automatic firearm, all of which were under the center console. Officers found the three cell phones in the front driver seat of the vehicle.

The defendant and Harris were interviewed. Officer Shelton interviewed Harris[.] *** Harris advised [defendant] picked him up from 715 North Independence Avenue. Harris advised they drove eastbound on Auburn Street to Rockton Avenue then on Rockton Avenue south.

Harris advised he heard gunshots to the north while they were driving on Woodlawn Avenue. Harris said soon after the gunshots were heard, they saw the police car stop next to them at the intersection of Woodlawn and Whitman Street. Harris advised he heard police yell stop and pullover [*sic*] but [defendant] fled. Harris wondered why [defendant] fled in the vehicle and told him pull over. [Defendant] refused and claimed he was going to drive to his mother's house at 715 Independence Avenue.

Harris advised he did not see who shot the gun. The officer explained to Harris about the evidence that the police had and told him that someone fired the gun in the vehicle that he was arrested in with [defendant]. Harris kept saying that he did not shoot the gun, and when asked if [defendant] did, Harris would only respond, I don't know.

Harris changed his story and claimed they stopped at Woodlawn Avenue and [defendant] exited the vehicle for 15 minutes to speak with a friend named,

- 4 -

JoJo. Harris said JoJo and [defendant] go way back and have been friends for a while.

Harris advised he heard shots fired close to JoJo and [defendant]. He believed someone shot a gun but wasn't sure who. He never saw [defendant] with a gun on that date and didn't see [defendant] shoot a gun.

In the defendant's interview with Officer Cerasa, the defendant told Officer Cerasa he dropped off his daughter *** to his daughter's mother's house around 2200 hours. Shortly after that, he picked up his friend named, Monique, and they drove to the southeast side of Rockford where they hung out with some friends of Monique.

[Defendant] could not clarify where he was at on the southeast side of Rockford. He said at some point they were with Monique's friends, his cousin, *** Harris, got into the vehicle with him. [Defendant] said Monique later requested to give her a ride to Woodlawn Avenue. He drove Monique to Woodlawn Avenue, said Harris sat in the front seat. [Defendant] said he parked on Woodlawn Avenue for 10 to 15 minutes and then left after Monique got out. [Defendant] said he did not see which—[*sic*] she walked to. [Defendant] said he started to drive away. He heard what sounded like fireworks. He said, as he drove away, a black car pulled in front of them. He was scared of the police and did not want to stop so he drove off.

He admitted he knew the police were behind him and stated he was too scared to stop so he drove to his house where he felt safe. He admitted the vehicle was his and said he knew nothing about the shots fired. He denied that the gun

was his or anything found in the vehicle was his and that's when the interview stopped."

Although the court asked neither Jazwiec nor defendant if he agreed with the proffer, Jazwiec never objected, and nothing in the record indicated defendant took issue with the proffer.

¶ 14                                    C. Defendant's Guilty Plea

¶ 15          In May 2021, defendant, pursuant to a superseding indictment, entered an open plea of guilty in the 2016 case to unlawful possession of a controlled substance, a Class 1 felony (720 ILCS 570/402(a)(1)(A) (West 2016)). Although the parties did not agree on a sentence to be imposed, they did agree that (1) the State would drop all the charges in the 2019 case and (2) defendant was subject to sentencing as a Class X offender, given his criminal history. The trial court admonished defendant, and the State gave a factual basis for defendant's guilty plea in the 2016 case. The court then accepted defendant's guilty plea.

¶ 16                                    D. The Sentencing Hearing

¶ 17          In June 2021, the trial court conducted defendant's sentencing hearing. Defendant presented testimony from his family, girlfriend, former employer, and church administrator. They testified generally that defendant worked hard, willingly helped others, was a good father, and was a caring and loving person. The court also admitted several exhibits that established defendant participated in various self-improvement classes while in jail.

¶ 18          The trial court also considered a presentence investigation report (PSI), which showed that defendant, who was 38 years old, had previously been convicted of 20 offenses, including criminal sexual abuse, possession of a stolen vehicle, and numerous drug crimes. Although the PSI listed the offenses with which defendant was charged in the 2019 case, it did not provide the details underlying those charges. Neither the State nor Jazwiec suggested any

- 6 -

amendments to the PSI, although the court had invited them to do so.

¶ 19    The following exchange then occurred:

"MR. DOHERTY [(ASSISTANT STATE'S ATTORNEY)]: The State would ask the Court to take judicial notice of the facts that were presented in [Harris's] case in which the defendant was charged in [the 2019 case]. In that case the defendant was charged with the offense of armed violence a Class X felony, with an enhanced sentence to 15 to 30 years. That would be consecutive sentencing to this case in [the 2016 case]. He's also charged with armed habitual criminal, 6 to 30 years at 85 percent. Once again, being a habitual criminal that was a mandatory life sentence as well as was also possession with intent to deliver methamphetamine, a Class X sentence, 6 to 30 years; Possession of a weapon by a felon, Class 2 felony, 3 to 14 years nonprobationable, Class X sentencing would apply; And aggravated fleeing to elude, Class 4 felony, extended term eligible 1 to 6 years. As the Court is well aware in conducting the trial against [Harris] in that case, the State presented evidence of the defendant's flight from police officers, his apprehension at a residence, subsequently a search of a vehicle belonging to the defendant and registered to the defendant, in which he was the driver, recovered a quantity of narcotics as well as a firearm. The State would ask the Court to take judicial notice of those facts as presented at trial in relevance to sentencing here in court today.

THE COURT: Mr. Jazwiec?

MR. JAZWIEC: Judge, Mr. Doherty and I did discuss whether or not he would present live witnesses, or rely upon the Court's recollection of the facts as

testified in that trial.

THE COURT: And then for the record, I do, and just because I'm the presiding Judge in the courtroom, I do know and am aware of, first of all, [defendant] being charged in the felony—with the set of felony offenses that Mr. Doherty read into the record. [Harris] did elect to and did go to jury trial last month or the month before; the Court did hear and did have the opportunity in connection with the evidence presented in *** Harris's jury trial; listen to, hear, and have the opportunity to consider that testimony not as a finder of fact, the Court's role in that case was to preside over the jury trial. So I was not making factual determinations. I would note that the jury, on the evidence presented to the jury in that case, acquitted *** Harris and found him not guilty. I would also note that for reasons of an effective oversight by the State to the drug charges against *** Harris were dismissed and it went to trial only on the offense of unlawful possession of a weapon by a felon and the evidence didn't convince the jury that *** Harris was the one that owned or possessed the weapon that was found inside a vehicle owned by [defendant], registered to [defendant], driven to a location where [defendant] either resided or planned to stay and parked in a driveway.

So I'm aware of all of the facts as they were alleged and set forth by witness testimony and that it is *** Harris wasn't convicted and it is a— [defendant] did not go to trial on that case, although that case is also a case that was dismissed in exchange for and pursuant to the plea agreement being presented to the Court here today. So I—it[']s information I am aware of having participated as a Trial Judge in the other case and so I know what all the witness testimony

was with respect to the events that were underlying that, including the alleged offenses of fleeing, possession of a firearm, and also and again possession of illegal controlled substances in the center console of the green SUV. Other than that, Mr. Doherty, anything additional to proffer or suggest and consider for evidentiary purposes?

MR. DOHERTY: Not for evidentiary purposes. No, Your Honor."

¶ 20 Jazwiec never objected to the trial court's consideration of the facts presented at Harris's trial.

¶ 21 At the conclusion of the sentencing hearing, the trial court sentenced defendant to 23 years in prison. In the court's oral ruling, which spanned 25 pages of the transcript, the court stated that it had considered, among other things, (1) the ancillary harm caused by drug dealing and (2) evidence presented at Harris's jury trial. Regarding Harris's trial, the court observed (1) Harris was a passenger in a vehicle "registered and owned by [defendant]," (2) defendant "was a pilot of the vehicle that fled at a high rate of speed from police officers," and (3) defendant "fled from a shot spotter alert in the neighborhood" and "pulled into a driveway." The court continued, "Harris complied with the officers['] request to exit the vehicle," but "[defendant] told officers instead to come and get him out of the vehicle."

¶ 22 The trial court also noted that, during a search of the vehicle, the police found, "regardless of attribution to whose they were, live ammunition, a black handgun with the magazine, a baggy [of] suspected cocaine, [and] a baggy of suspected ecstasy pills." The court mentioned that "the handgun and the baggies were within a few inches of each other in an interior compartment of the vehicle owned by and registered to [defendant]."

¶ 23 The trial court also commented that Harris was acquitted following a jury trial

because he demonstrated to the satisfaction of the jury he was not aware of the firearm in defendant's vehicle. The court also emphasized several times defendant committed the offenses charged in the 2019 case while he was on bond in the 2016 case. The court found, given this, "it's difficult, if not impossible for the Court to judge, that [defendant] is unlikely to commit another crime."

¶ 24                               E. Postsentencing Proceedings

¶ 25                               1. *Defendant's First Motion To Reconsider the Sentence*

¶ 26          The same month defendant was sentenced, he filed a motion to reconsider his sentence, arguing only that his sentence was excessive. At the same time, Jazwiec filed a motion to withdraw as counsel.

¶ 27          In July 2021, the trial court granted Jazwiec's motion to withdraw, and in August 2021, new counsel, Barry Lewis, filed an appearance. Lewis later adopted Jazwiec's motion to reconsider. Neither attorney filed a certificate under Illinois Supreme Court Rule 604(d) (eff. July 1, 2017).

¶ 28          In January 2022, following a hearing, the trial court denied the motion. The court again emphasized defendant committed the offenses in the 2019 case while out on bond in the 2016 case. Specifically, the court stated the following:

> "[O]ne of the bigger considerations in the context of the testimony of witnesses that was presented, that were presented at the sentencing hearing is the fact that [defendant], while knowing, having posted bond but while knowing that he was facing *** the possibility of going to prison for the absolute rest of his natural life was charged with the [offenses in the 2019 case], that's a case that didn't go to trial, it's a case that got dismissed by the State, but it's also a case where

- 10 -

[defendant] was again subject to natural life sentencing."

Similarly, the court stated:

"The problem is that [defendant] at some point and in this case, specifically at a

point when pending on a natural life sentencing eligible felony possession with

intent to deliver drugs, can't not commit new crimes.

And that is one of the driving factors for the Court, and the Court has

every right to consider what the [PSI] considers a substantial criminal history."

¶ 29        Defendant appealed, and this court remanded the case for the filing of a Rule 604(d) certificate and new postsentencing proceedings. See *People v. Skinner*, No. 4-22-0068 (2022) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 30        2. *Defendant's Second Motion To Reconsider the Sentence*

¶ 31        On remand, Lewis filed a Rule 604(d) certificate and then moved to withdraw as counsel. The trial court allowed Lewis to withdraw and appointed Assistant Public Defender Sean Trausch to represent defendant. Trausch filed a new motion to reconsider defendant's sentence, along with a Rule 604(d) certificate. Trausch argued, among other things, the court erred when it considered (1) facts from Harris's jury trial and (2) the societal harm of drug dealing, which constituted an improper double sentencing enhancement.

¶ 32        In April 2024, following a hearing on defendant's second motion to reduce his sentence, the trial court reduced defendant's sentence from 23 to 20 years in prison, acknowledging that it had improperly considered the societal harm caused by drug dealing. In the 26-page transcript of the oral ruling, the court addressed whether it also improperly considered facts from Harris's trial, explaining as follows:

"[Defendant] was still pending on his new set of charges [in the 2019 case], all of

which were natural life sentencing eligible offenses at the same time [the 2016 case was pending], which, in the good graces of the State, the State dismissed [the offenses in the 2019 case] as a part of the plea to this [2016] case."

The court found the State asked it to consider facts from Harris's trial, which it did, and disagreed with any contention it improperly speculated why the jury acquitted Harris, noting:

"Harris *** had a plausible ability to argue to the jury that it was not his car, which was true, that it was not him that resisted getting out of the vehicle, which was true, [and] that he did not fight with police officers upon getting out of the vehicle, which was true."

¶ 33    Immediately following the trial court's ruling, defendant personally disputed several facts presented at Harris's trial. For example, defendant claimed he did not own the vehicle, never refused to exit the vehicle, and never wrestled with the police. However, defendant asserted, "There were 10 plus officers with their guns pointed at me, telling me if I moved, they was going to shoot me. So when they told me to open the door, I told them I wasn't going to move and y'all come and open the door."

¶ 34    After acknowledging defendant and the trial court had different perspectives, the court stated the following:

"[O]ne of the things that was known at the time is that you got a full set of felony charges [in the 2019 case] tossed out as a part of the agreement [in the 2016 case]. That is unmistakably true. They dismissed the entire other case. And I guarantee you it wasn't because [the assistant state's attorney] didn't think he could prove it. [He] was a good attorney. He worked very hard. He was very helpful to *** Jazwiec along the way. But I don't know what would have happened and you

- 12 -

don't either. But [going to prison for the rest of your life] was a danger you faced. You have to acknowledge [that]."

¶ 35 This appeal followed.

¶ 36 II. ANALYSIS

¶ 37 Defendant appeals, arguing that he was denied a fair sentencing hearing because the trial court considered facts presented at Harris's jury trial. We disagree and affirm.

¶ 38 Defendant's argument fails for two reasons. First, defendant affirmatively acquiesced to the trial court's consideration of facts from Harris's trial. Second, procedural default aside, the court's consideration of those facts from Harris's trial did not violate defendant's right to a fair sentencing hearing.

¶ 39 A. Procedural Default

¶ 40 Defendant never objected during his sentencing hearing to the trial court's consideration of the evidence presented at Harris's trial. In fact, he did not raise the issue at all until after his case was remanded back to the trial court from his direct appeal, when he filed his second motion to reconsider his sentence.

¶ 41 Given this failure, the State argues that defendant has forfeited any appellate review of this issue because he did not make a contemporaneous objection. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required.").

¶ 42 Forfeiture aside, the State also contends that defendant waived the issue when he "affirmatively acquiesced in the court's action in taking judicial notice of [Harris's] trial," and, therefore, he "may not be heard to complain of error" now.

¶ 43 In reply, defendant denies he forfeited the issue but, in the alternative, asks us to

consider his claim under the plain error rule if we conclude that he did. He also contends he did not acquiesce to the trial court's consideration of facts from Harris's trial when sentencing him and, to the extent he did, the court went "well beyond" the limited facts the State asked the court to consider.

¶ 44        We agree with both of the State's contentions.

¶ 45                                1. *The Applicable Law*

¶ 46        In *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 51, this court explained the relationship among waiver, forfeiture, plain error, and affirmative acquiesce and wrote the following:

>        " 'Waiver is the intentional relinquishment of a known right, whereas
>
>        forfeiture is the failure to make a timely assertion of a known right.' [Citation.]
>
>        'In the course of representing their clients, trial attorneys may (1) make a tactical
>
>        decision not to object to otherwise objectionable matters, which thereby waives
>
>        appeal of such matters, or (2) fail to recognize the objectionable nature of the
>
>        matter at issue, which results in procedural forfeiture.' [Citation.] The doctrine of
>
>        plain error permits a reviewing court to consider arguments that a defendant
>
>        forfeited by failing to raise them to the trial court. [Citation.] However, the plain-
>
>        error doctrine does not apply to affirmative acquiescence. [Citation.] 'When ***
>
>        defense counsel affirmatively acquiesces to actions taken by the trial court, a
>
>        defendant's only challenge may be presented as a claim for ineffective assistance
>
>        of counsel on collateral attack.' "

¶ 47                                2. *This Case*

¶ 48        We conclude that defendant affirmatively acquiesced to the trial court's

consideration of facts presented at Harris's trial. At defendant's sentencing hearing, the State recited the offenses with which defendant was charged in the 2019 case and delineated the sentences that could have been imposed if he were convicted. The State then asked the court to "take judicial notice" of "those facts as presented at [Harris's] trial in relevance to the sentencing here in court today." The State explicitly stated that "those facts" included defendant's fleeing from the police in a vehicle registered to him, his arrest later at a residence, and the discovery of narcotics and a firearm in his vehicle.

¶ 49        Immediately after the State made this request, the trial court inquired, "Mr. Jazwiec?", which provided defendant's counsel the opportunity to object to the court's consideration of the facts presented during Harris's trial. See *People v. Kaczmarek*, 207 Ill. 2d 288, 297 (2003) (a defendant is bound by the affirmative acts of his counsel). But Jazwiec did not object. Instead, he acknowledged that he and the State had discussed whether the State "would present live witnesses, or rely upon the Court's recollection of the facts as testified in" Harris's jury trial. Jazwiec did not elaborate on the outcome of that discussion, but he stood silent as the court explained its familiarity with those proceedings, such that the court could consider them as the State had requested. Under these circumstances, we conclude that defendant affirmatively acquiesced to the court considering the evidence presented at Harris's jury trial when sentencing him.

¶ 50        Defendant claims he never affirmatively acquiesced because "no explicit invitation" was made, asking him specifically if he would allow the trial court to consider the facts presented at Harris's trial. We disagree because his contention is plainly contradicted by the record.

¶ 51        Although the court never formally asked Jazwiec if he consented to the court's

- 15 -

consideration of facts presented at Harris's trial (see *id.*), requiring the court to make a formal invitation is completely unnecessary, especially given the context of the proceedings. We conclude that it was abundantly clear what the court was asking a well-seasoned attorney.

¶ 52    The State asked the trial court to consider all the evidence presented at Harris's trial, and Jazwiec, as we have explained, agreed, essentially stipulating to the court's consideration of all the testimony presented at Harris's trial. See *Hibbler*, 2019 IL App (4th) 160897, ¶ 59 (after determining defense counsel affirmatively acquiesced to the court's consideration of the defendant's PSI, we observed "[a]nother way of viewing defense counsel's conduct *** is that counsel was essentially stipulating that the court may consider all of the information contained in the PSI").

¶ 53    Accordingly, because Jazwiec essentially stipulated to the trial court's consideration of all the testimony from Harris's trial, defendant cannot now complain that it was error for the court to do so. See *id.* ("Parties who agree to the admission of evidence through a stipulation are estopped from later complaining about that evidence being stipulated into the record." (Internal quotation marks omitted.)).

¶ 54    Even if we assume the State asked the trial court to limit what it considered—an assumption we conclude the record does not support—the record reveals the court did not, as defendant claims, consider evidence "well beyond" what the State mentioned. The State, when asking the court to "take judicial notice" of the facts presented at Harris's trial, specifically mentioned five matters: (1) the vehicle was registered to defendant, (2) defendant was driving the vehicle, (3) defendant fled from the police, (4) defendant was apprehended at a residence, and (5) narcotics and a firearm were found in defendant's vehicle. When sentencing defendant, the court mentioned those same five matters.

¶ 55　　　　Although the trial court also mentioned defendant "fled from a shot spotter alert in the neighborhood," traveled "at a high rate of speed," and refused to get out of the vehicle, where the police found "live ammunition, a black handgun with the magazine, a baggy [of] suspected cocaine, [and] a baggy of suspected ecstasy pills," we conclude any consideration of these more detailed facts makes no difference.

¶ 56　　　　　　　　　　　　B. The Sentencing Hearing

¶ 57　　　　On the merits, defendant argues his sentence is excessive because, by allowing the trial court to consider facts presented at Harris's trial when sentencing him, which he claims was improper, he was denied a fair sentencing hearing. We disagree.

¶ 58　　　　　　　　1. *The State's Incorrect Use of "Judicial Notice"*

¶ 59　　　　During oral argument before this court, defense counsel repeatedly emphasized that at defendant's sentencing hearing, (1) the State asked the trial court to "take judicial notice" of Harris's jury trial, over which the sentencing judge had presided, (2) defendant's trial counsel's response, while somewhat ambiguous, indicated no objection to the court's doing so, and (3) the court agreed that it would "take judicial notice" of Harris's jury trial, as the State requested. Defendant characterizes the State's request as asking the court to accept what the court heard at Harris's trial "as the underlying truth of those allegations [against Harris and defendant] as though they were proven facts that had been either judicially determined or were undisputed."

¶ 60　　　　In support of defendant's argument that the trial court improperly took judicial notice in this case, defendant cites Illinois Rule of Evidence 201(b) (eff. Jan. 1, 2011), which states the following: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or

(2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

¶ 61    Defendant is correct that the State should not have asked the trial court to "take judicial notice" of facts from Harris's trial, but no error occurred in this case because the court—in fact—did not "take judicial notice" of facts from Harris's trial; instead, the court took into consideration at defendant's sentencing hearing *the evidence* the court heard at Harris's trial when the court determined the appropriate sentence for defendant.

¶ 62                    2. *The Doctrine of Judicial Notice*

¶ 63    "Facts of which a [trial] court may properly take judicial notice are those facts which are in the common and general knowledge and are known to well-informed persons in the community so that they may be accepted by the court without proof." *Motion Picture Appeal Board of Chicago v. S.K. Films*, 65 Ill. App. 3d 217, 226 (1978); see Ill. R. Evid. 201(b) (eff. Jan. 1, 2011) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); Black's Law Dictionary (12th ed. 2024) ("[J]udicial notice" is "[a] court's acceptance, for purposes of convenience and without requiring a party's proof, of a well-known and *indisputable* fact." (Emphasis added.)). "[The facts] must be 'known and well established and authoritatively settled, not doubtful or uncertain.' " *Motion Picture Appeal Board of Chicago*, 65 Ill. App. 3d at 226 (quoting *Sproul v. Springman*, 316 Ill. 271, 279 (1925)).

¶ 64                    3. *This Case*

¶ 65    The language the State used in its request—namely, that "the court take judicial notice" of Harris's trial—was inappropriate. But this record makes clear beyond doubt that

- 18 -

everyone at the trial level—the trial court, the prosecutor, and defense counsel—understood that the State's request was for the trial court *to take into consideration at sentencing the evidence* the court heard at Harris's trial. That is all that happened and nothing more.

¶ 66            In other words, no party asked or expected the trial court to view that evidence as "not subject to reasonable dispute," which is one of the hallmarks of a court's taking judicial notice.

¶ 67            The issue before us ultimately comes down to the State's use of an incorrect term—"to take judicial notice"—to describe (1) what the State was really requesting, (2) what defense counsel acquiesced to, and (3) what the trial court actually did. This point was made clear during oral argument, when this court asked defendant's appellate counsel if he could claim trial court error on these facts if (1) the State had simply asked the court to consider the evidence presented at Harris's trial, (2) the court had agreed to consider that evidence, and (3) no one ever used the term "take judicial notice." Counsel ultimately conceded that the court's consideration of that evidence under those circumstances would be permissible, but counsel still claimed that the court's remarks at sentencing went beyond the evidence at Harris's trial.

¶ 68            However, whether the trial court in fact did so is a separate issue that we previously addressed in this opinion (*supra* ¶ 55), in which we concluded that even if the court had considered any more detailed facts, its doing so would make no difference.

¶ 69            We have discussed at some length the trial court's consideration of evidence at Harris's trial because this court's experience has shown that the inappropriate language used in this case appears far too often in records before us. That is, parties frequently request a trial court "take judicial notice" of some proceedings when, in fact, that is not what they mean at all. Instead, what they are really asking is for the court—as in this case—to consider some evidence

the court heard at an earlier proceeding.

¶ 70        And when—again, as here—the other party has no objection, the parties have essentially stipulated to the trial court's consideration of that earlier evidence, with the court free to evaluate that evidence as the court sees fit.

¶ 71        Our conclusion that this court should analyze the trial court proceedings in this case based upon what the State was really requesting, as opposed to the inappropriate label the State gave to its request, is consistent with long-standing Illinois law. For instance, in *In re Haley D.*, 2011 IL 110886, ¶ 67, the Illinois Supreme Court determined that it would consider the respondent's response to the State's motion to strike even though that response cited the wrong section of the Code of Civil Procedure, explaining as follows: "[W]e have emphasized that the character of the pleading should be determined from its content, not its label. Accordingly, when analyzing a party's request for relief, courts should look to what the pleading contains, not what it is called." See *Pasquinelli v. Sodexo, Inc.*, 2021 IL App (1st) 200851, ¶ 27 ("Notwithstanding the title of a motion, courts look to the substance of the motion to determine which section of the Code of Civil Procedure governs." (Emphases omitted.)); *Papadakis v. Fitness 19 IL 116, LLC*, 2018 IL App (1st) 170388, ¶ 32 ("[T]he character of [a] pleading should be determined from its content, not its label." (Internal quotation marks omitted.)).

¶ 72        In this case, although the State titled its request that the trial court "take judicial notice," that inappropriate title clearly did not reflect what the State was really asking—namely, that at defendant's sentencing hearing, the court should consider the evidence the court heard at Harris's trial.

¶ 73        And, as we have noted, neither the trial court nor defense counsel misunderstood the true nature of the State's request.

¶ 74                              4. *Fair Sentencing Hearing*

¶ 75                              a. The Applicable Law

¶ 76        Relevant and reliable information at sentencing includes evidence the defendant committed different crimes, and "where no objection is made by the defendant, such prior acts may be called to the court's attention without resorting to formal proof." *People v. Faulkner*, 12 Ill. 2d 176, 183-84 (1957).

¶ 77        In *People v. Dillard*, 2025 IL App (4th) 230739, ¶¶ 152-54, this court recently wrote the following about sentencing hearings and the applicable standard of review:

"Every criminal defendant has the right to be sentenced based on only proper sentencing factors. [Citation.] When fashioning a defendant's sentence, a trial court should consider '(1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for punishment and deterrence.' [Citation.] ***

'A reviewing court gives substantial deference to the trial court's sentencing decision because the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age.' [Citation.] '[A] reviewing court presumes that a sentence imposed within the statutory range provided by the legislature is proper.' [Citation.]

We review whether the trial court relied on an improper sentencing factor *de novo*. [Citation.] 'In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the

record as a whole, rather than focusing on a few words or statements by the trial court.' "

¶ 78                                              b. This Case

¶ 79         Nothing in the record before us suggests defendant was denied a fair sentencing hearing because the evidence from Harris's jury trial—which the trial court considered at defendant's sentencing hearing—was not relevant or reliable. That evidence was reliable because the State and Harris were represented by counsel, a judge presided over the proceedings, and the rules of evidence were applied.

¶ 80         To the extent defendant argues such evidence was not reliable because it "was not *** subject to confrontation by *** defendant," we note that the right to confront witnesses does not apply at sentencing hearings. See, *e.g.*, *Williams v. Oklahoma*, 358 U.S. 576, 584 (1959) ("[O]nce the guilt of the accused has been properly established, the sentencing judge, in determining the kind and extent of punishment to be imposed, is not restricted to evidence derived from the examination and cross-examination of witnesses in open court ***."). If defendant wished to challenge the evidence, nothing prevented him from refusing to stipulate to the evidence from Harris's trial. When defense counsel was asked to comment after the State requested the trial court "take judicial notice" of the facts from Harris's trial, counsel could have said he did not agree and demand instead that the State present live witness testimony so he could confront the witnesses. Nothing about this process was unfair.

¶ 81         The evidence presented at Harris's trial was also relevant in assessing, among other things, defendant's rehabilitative potential and his history of criminal activity, as well as his general moral character, mentality, habits, social environment, abnormal or subnormal tendencies, natural inclination or aversion to commit crime, and motivation to commit crime.

*People v. Adkins*, 41 Ill. 2d 297, 301 (1968); see *United States v. Tucker*, 404 U.S. 443, 446 (1972) (in sentencing a defendant, a trial court "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information [it] may consider, or the source from which it may come"); *People v. Williams*, 149 Ill. 2d 467, 490 (1992) (a court can look within reasonable bounds for information that is relevant and reliable); see also Ill. R. Evid. 1101(b)(3) (eff. Sept. 17, 2019) (providing that the formal rules of evidence do not apply in sentencing proceedings).

¶ 82        Moreover, and significantly, we note that much of the same evidence presented at Harris's trial was also proffered at defendant's bond hearing, which was far from a perfunctory proceeding. Neither Jazwiec nor defendant took issue with the substance or accuracy of that proffer. Given all the above, we conclude that the information from Harris's trial that the court considered when sentencing defendant was relevant and reliable.

¶ 83        As an aside, we observe that, in our opinion, it was sound trial strategy for Jazwiec to allow the trial court at defendant's sentencing hearing to consider the evidence presented at Harris's trial. After all, given that the evidence regarding defendant's involvement in the 2019 case would clearly be admissible at defendant's sentencing hearing, defendant's argument for a lesser sentence would hardly have been helped if the State (as it could have) called the police to testify in person about defendant's criminal conduct in the 2019 case.

¶ 84        In support of our conclusion that the trial court committed no error in this case, we note cases from other jurisdictions that have held it is proper for a trial court to consider evidence from a codefendant's case when sentencing the defendant. See, *e.g.*, *United States v. Scott*, 243 F.3d 1103, 1108 (8th Cir. 2001) ("In sentencing [the defendant], the [trial] court stated that it had 'heard the trial of the other defendants in this case' and found that the crack cocaine

- 23 -

sales in Minnesota were reasonably foreseeable relevant conduct [for purposes of a sentencing enhancement]. The court was entitled to consider relevant evidence introduced at the trial of [a] co-defendant ***."); *United States v. Moore*, 55 F.3d 1500, 1501-02 (10th Cir. 1995) (explaining that the trial court that presided over the defendant's and the codefendant's cases could consider, in sentencing the defendant, hearsay statements the codefendant made during his case concerning the value of misappropriated property because such facts were relevant and reliable); *People v. Evans*, 190 Cal. Rptr. 633, 635 (Ct. App. 1983) (concluding the trial court could consider the codefendant's case file in sentencing the defendant because the information in it was reliable and pertinent to the role the defendant played in the crime).

¶ 85        The opinion of the Eighth Circuit Court of Appeals in *United States v. Fetlow*, 21 F.3d 243 (8th Cir. 1994), is particularly on point. In that case, the defendant and three codefendants were charged with various drug-related offenses. *Id.* at 246. The defendant pleaded guilty, and his three codefendants were tried by a jury and found guilty. *Id.* at 246-47. The same trial court judge presided over the cases of the defendant and his codefendants. *Id.* at 247. The defendant was subject to an enhanced sentence if the government presented evidence that the "defendant was a manager or supervisor of a criminal activity that involved five or more participants or was otherwise extensive." *Id.* at 249. No evidence was presented at the defendant's sentencing hearing. *Id.* at 250. The court imposed an enhanced sentence based upon evidence presented at the codefendants' jury trials. *Id.* at 249. The defendant appealed, taking issue with the "insufficien[cy of the] evidence to support the [enhanced sentence]." *Id.*

¶ 86        The Eighth Circuit Court of Appeals found nothing improper about the trial court's reliance on evidence presented during the codefendants' trials to enhance the defendant's sentence, explaining as follows:

"A formal sentencing hearing is not *** the exclusive means by which the government may meet [its] evidentiary burden ***. This [court] has held that [sentencing enhancements] may be satisfied where a sentencing judge, who also presides over a defendant's trial, makes findings based on evidence presented at the trial phase even though no additional exhibits or testimony are introduced at the sentencing phase. [Citation.] Here, due to [the defendant's] guilty plea, the government did not have an opportunity to produce evidence addressed to the *** enhancement at his trial. The government did, however, introduce evidence that [the defendant] was a key member of a cocaine distribution ring that involved at least five participants at the trials of [the] co-defendants ***. We hold that in determining whether the government has met the evidentiary burden which applies when a sentencing court elects to make a finding on an issue disputed at the sentencing phase, the sentencing court may consider, without rehearing, evidence introduced at the trial of a co-defendant if that evidence is relevant to the issue disputed at the sentencing phase, and if the sentencing judge also presided over the co-defendant's trial." *Id.* at 250.

¶ 87     Here, as in *Fetlow*, the same judge presided over the cases of both defendant and Harris; like the codefendants in *Fetlow*, Harris proceeded to a jury trial; defendant, like the defendant in *Fetlow*, pleaded guilty; and the trial court, like the court in *Fetlow*, considered evidence presented at the case of a codefendant (here, Harris) in sentencing defendant.

¶ 88     When sentencing a defendant, nothing prevents a trial court from considering a defendant's past criminal conduct that never resulted in a conviction. *People v. Jackson*, 149 Ill. 2d 540, 548 (1992) ("[C]riminal conduct for which there has been no prosecution or conviction

may be considered in sentencing."). Accordingly, the court in this case could consider defendant's criminal conduct in the 2019 case when sentencing him for the 2016 case, as long as the information on which the court relied was relevant and reliable. See *Fetlow*, 21 F.3d at 250. As we have explained, defendant's criminal activity in the 2019 case, like the defendant's role in the drug-related offenses in *Fetlow*, certainly was relevant and reliable in assessing what sentence to impose on defendant in connection with his guilty plea in the 2016 case. See *id.*

¶ 89 Defendant cites *People v. Dameron*, 196 Ill. 2d 156 (2001), *People v. Rivers*, 410 Ill. 410 (1951), and *People v. Dempsey*, 242 Ill. App. 3d 568 (1993), in support of his argument that the trial court erred by relying on evidence presented at Harris's trial. These cases are inapposite. The information in those cases on which the trial courts relied in making their decisions fell well outside what is reasonable to consider. Specifically, the courts in those cases improperly relied on (1) a library book and a 32-year-old transcript from an unrelated death penalty case (*Dameron*, 196 Ill. 2d at 172-74, 176-79); (2) a weeks-long private investigation by the trial court, about which the supreme court noted that it "[had] no way of knowing what was said to [the trial court], by whom, or for what purpose" (*Rivers*, 410 Ill. at 415, 419); and (3) "unfounded fear and prejudice relating to HIV infection" and speculation the defendant infected his girlfriend with HIV (*Dempsey*, 242 Ill. App. 3d at 598). The aforementioned information in those cases was (1) never presented by any of the parties and (2) not relevant or reliable.

¶ 90 Here, the evidence from Harris's trial was properly considered because, aside from the fact it was presented to the trial court at defendant's sentencing hearing and the parties agreed the court could consider it, the evidence was relevant and reliable.

¶ 91 Defendant contends, like in *Dameron*, *Rivers*, and *Dempsey*, the trial court gave

too much weight to the facts from Harris's trial and improperly speculated about two matters therefrom. Specifically, he claims the court improperly (1) speculated "why it *thought* that the jury acquitted Harris" (emphasis in original) and (2) "speculated *** why [the State] dismissed [its] charges against [defendant in the 2019 case], saying 'I guarantee you it wasn't because [the State] didn't think [it] could prove it.' " Defendant also argues the court improperly considered facts from Harris's trial to be the " 'biggest consideration.' " We disagree.

¶ 92            Not only does the record not support defendant's contentions, but to the extent there was any speculation by the trial court, it was simply irrelevant to defendant's ultimate sentence. The trial court's isolated musings in its lengthy rulings about why the jury acquitted Harris and why the State dismissed the charges in the 2019 case, even if improper, mean little, if anything, given all the proper factors the court addressed. See *People v. Bourke*, 96 Ill. 2d 327, 333 (1983) (holding that the trial court's consideration of an improper aggravating factor was not error because "the record adequately demonstrate[d] that the weight placed on the improperly considered aggravating factor was so insignificant that it did not result in a greater sentence"); *People v. Fort*, 229 Ill. App. 3d 336, 340 (1992) ("An isolated remark made in passing, even though improper, does not necessarily require that [the] defendant be resentenced."). Although it would have been better if the court did not muse about such matters, we conclude such ponderings, on this record, are of no concern on appeal.

¶ 93            Moreover, the record reveals, other than reciting the facts from Harris's trial, the trial court mentioned the 2019 case numerous times because it was most concerned with the fact defendant committed the offenses in the 2019 case while he was released on bond in the 2016 case. The court noted that defendant was well aware he faced natural life in prison in the 2016 case. The court characterized *that* concern as one of its "bigger considerations" and "driving

factors," asserting, at one point, "[I]t's difficult, if not impossible for the Court to judge, that [defendant] is unlikely to commit another crime." Nothing about these concerns was improper. See 730 ILCS 5/5-5-3.1(a)(9) (West 2018) (in sentencing, a court may consider whether "[t]he character and attitudes of the defendant indicate that he is unlikely to commit another crime").

¶ 94    In sum, we conclude defendant procedurally defaulted the issue he raises. We also conclude, procedural default aside, the trial court did not improperly consider facts from Harris's trial when it sentenced defendant.

¶ 95                           III. CONCLUSION

¶ 96    For the reasons stated, we affirm the trial court's judgment.

¶ 97    Affirmed.

*People v. Skinner*, 2025 IL App (4th) 240689

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 16-CF-588; the Hon. Brendan A. Maher, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and James Henry Waller, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and David E. Mannchen, of State's Attorney's Appellate Prosecutor's Office, of counsel), for the People. |